**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE**

**PUBLIC VERSION**

| | |
|---|---|
| CANADIAN SOLAR INTERNATIONAL LIMITED, *et al.*, | ) ) ) |
| *Plaintiffs,* | ) ) |
| and, | ) ) |
| NEXTERA ENERGY CONSTRUCTORS, LLC, | ) ) |
| *Plaintiff-Intervenor,* | ) ) Ct. No. 23-00222 |
| v. | ) ) |
| UNITED STATES, | ) ) |
| *Defendant,* | ) ) |
| and, | ) ) |
| AUXIN SOLAR INC., | ) ) |
| *Defendant-Intervenor.* | ) ) |
| | ) |
| TRINA SOLAR SCIENCE & TECHNOLOGY (THAILAND) LTD., | ) ) ) |
| *Plaintiff,* | ) ) |
| and, | ) ) Ct. No. 23-00227 |
| CANADIAN SOLAR INTERNATIONAL LIMITED *et al.*, | ) ) |

|  | ) |
| --- | --- |
| *Plaintiff-Intervenors,* | ) |
|  | ) |
| v. | ) |
|  | ) |
| UNITED STATES, | ) |
|  | ) |
| *Defendant,* | ) |
|  | ) |
| and, | ) |
|  | ) |
| AUXIN SOLAR INC., | ) |
|  | ) |
| *Defendant-Intervenor.* | ) |
| _____ | ) |

**PUBLIC VERSION MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT UPON THE AGENCY RECORD OF PLAINTIFFS TRINA SOLAR SCIENCE & TECHNOLOGY (THAILAND) LTD.; CANADIAN SOLAR INTERNATIONAL LIMITED; AND CANADIAN SOLAR MANUFACTURING (THAILAND) CO., LTD.**

Jonathan M. Freed
MacKensie R. Sugama
**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE,
Suite 500
Washington, DC  20003
(202) 223-3760
jfreed@tradepacificlaw.com

*Counsel for Trina Solar Science & Technology (Thailand) Ltd.*

Jonathan T. Stoel
Michael G. Jacobson
Nicholas R. Sparks
**HOGAN LOVELLS US LLP**
Columbia Square Building
555 Thirteenth Street, NW.
Washington, DC 20004
(202) 637-6634
jonathan.stoel@hoganlovells.com

*Counsel for Canadian Solar International Limited and Canadian Solar Manufacturing (Thailand) Co., Ltd.*

Dated: June 13, 2024

# TABLE OF CONTENTS

I.  STATEMENT PURSUANT TO RULE 56.2(C) .......................................2

  A.  Administrative Determination Under Review .......................2

  B.  Issues Presented.............................................................3

    i.  Whether Commerce's affirmative determination of circumvention in Thailand is supported by substantial evidence when Commerce found that four out of five (for TTL) and three out of five (for CSIL) of the Minor or Insignificant Factors weighed against a finding of circumvention? ...................................................................3

    ii.  Whether Commerce's findings with respect to research and development ("R&D") in Thailand are supported by substantial evidence and in accordance with law when CSIL and TTL presented evidence of R&D?....................................................................5

    iii.  Whether Commerce's findings with respect to the value of processing in Thailand for CSIL are supported by substantial evidence and otherwise in accordance with law when Commerce reached opposite outcomes in reliance on the same figures?............5

    iv.  Whether Commerce's affirmative determination of circumvention in Thailand is supported by substantial evidence when contrasted with Commerce's finding that the nature of production of crystalline silicon photovoltaic ("CSPV") cells and modules is significant and complex? ....................................................................6

    v.  Whether Commerce sufficiently demonstrated that an affirmative determination of circumvention was "appropriate," pursuant to the terms of the statute? .........................................................7

II.  STATEMENT OF FACTS .............................................................7

  A.  Solar I Orders ................................................................8

  B.  Solar II Orders ..............................................................11

  C.  Circumvention Inquiries ..................................................12

  D.  Preliminary Determination................................................16

    i.  Preliminary Analysis of Minor or Insignificant Factors .................18

  E.  Final Determination.........................................................25

III. STANDARD OF REVIEW ........................................................................ 28

IV. ARGUMENT ....................................................................................... 30

  A. The Statutory Criteria Weigh Heavily in Favor of Finding that Each of TTL's and CSIL's Production of Cells and Modules in Thailand Is Not Minor or Insignificant ........................................................... 32

  B. Commerce Acted Contrary to Law by Elevating the R&D Factor Over All Other Factors and Ignored Substantial Evidence Demonstrating Significant R&D Undertaken in Thailand .......................................... 39

    i. Commerce Failed to Explain its Unreasonable Decision to Elevate the R&D Factor Above All Other Factors ......................................... 39

    ii. Commerce Failed to Engage with Substantial Evidence That Demonstrates Significant R&D in Thailand .................................... 46

  C. Commerce's Findings Regarding the Value of Processing Performed in Thailand Are Arbitrary and Inexplicably Ignore Agency Precedent .. 49

    i. Commerce Failed to Conduct the Required Qualitative Value-Added Analysis ................................................................................... 50

    ii. Commerce's Assessment of the Value Added in Thailand Is Inconsistent with the Department's Precedent ............................... 54

  D. Substantial Evidence Does Not Support a Conclusion that the Process of Assembly or Completion in Thailand is Minor or Insignificant ...... 57

  E. Commerce Failed to Demonstrate that an Affirmative Circumvention Determination Was "Appropriate" Under Section 781(b)(1)(E) of the Act ........................................................................................... 62

V. CONCLUSION .................................................................................... 68

# TABLE OF AUTHORITIES

C<small>ASES</small>

*Burlington Truck Lines, Inc. v. United States,*
    371 U.S. 156, (1962) ...........................................................................29

*Coalition of Am. Flange Producers v. United States,*
    517 F. Supp. 3d 1378, (Ct. Int'l Trade 2021) ..................................38

*Daewoo Elecs. Co. v. Int'l Union of Elec., Tech., Salaried & Mach.*
*Workers, AFL-CIO,*
    6 F.3d 1511, (Fed. Cir. 1993)............................................................29

*Gallant Ocean (Thailand) Co. v. United States,*
    602 F.3d 1319, (Fed. Cir. 2010).......................................................29

*Kisor v. Wilkie,*
    588 U.S. 558, (2019) ...........................................................................35

*Liberty Frozen Foods Pvt., Ltd. v. United States,*
    731 F. Supp. 2d 1249, (Ct. Int'l Trade 2011) ..................................35

*Michigan v. EPA,*
    576 U.S. 743, (2015) ...........................................................................63

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29, (1983). ............................................................................29

*N.L.R.B. v. Columbian Enameling & Stamping Co.,*
    306 U.S. 292, (1939) ...........................................................................30

*NMB Sing. Ltd.* v. *United States,*
    557 F.3d 1316, (Fed. Cir. 2009).......................................................31

*Nucor Corporation v. United States,*
    461 F. Supp. 3d 1374, (Ct. Int'l Trade 2020) ..................................30

*Sunpreme Inc. v. United States,*
    946 F.3d 1300 (Fed. Cir. 2020).........................................................11

*Universal Camera Corp. v. N.L.R.B.*,

   340 U.S. 474, (1951) ................................................................. 29

<u>S</u>TATUTES

19 U.S.C. § 1516a(b)(1)(B)(i) .................................................. 30

19 U.S.C. § 1677f(i)(3)(A) ...................................................... 31

19 U.S.C. § 1677j ................................................................... 64

19 U.S.C. § 1677j(b)(1) .................................................. passim

19 U.S.C. § 1677j(b)(2) .................................................. passim

<u>A</u>DMINISTRATIVE <u>M</u>ATERIALS

*Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China,*

   88 Fed. Reg. 57,419 (Dep't Commerce Aug. 23, 2023) ......................... 3

*Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*

   87 Fed. Reg. 75,221 (Dep't Commerce Dec. 8, 2022) ......................... 16

*Certain Corrosion-Resistant Steel Products from Taiwan,*

   84 Fed. Reg. 32,864 (Dep't Commerce July 10, 2019) ......................... 51

*Certain Crystalline Silicon Photovoltaic Products From Taiwan: Antidumping Duty Order,*

   80 Fed. Reg. 8,596 (Dep't Commerce Feb. 18, 2015) ......................... 12

*Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China,*

   80 Fed. Reg. 8,592 (Dep't Commerce Feb. 18, 2015) ......................... 12

*Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China,*

   79 Fed. Reg. 76,970 (Dep't Commerce Dec. 23, 2014) ......................... 12

*Certain Pasta from Italy*,

   68 Fed. Reg. 46,571, 46,575 (Dep't Commerce Aug. 6, 2003) .............. 52

*Certain Tissue Paper Products from the People's Republic of China*, 7

   3 Fed. Reg. 21,580 (Dep't Commerce Apr. 22, 2008) ........................... 55

*Certain Walk-Behind Lawn Mowers and Parts Thereof From the People's Republic of China*,

   88 Fed. Reg. 13,434 (Dep't Commerce Mar. 3, 2023) ......................... 64

*Crystalline Silicon Photovoltaic Cells and Modules From China*,

   Inv. Nos. 701-TA-481 and 731-TA-1190, USITC Pub. 4360 (Nov. 2012) (Final) ......................................................................................................... 96

*Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products*,

   Inv. No. TA-201-75, USITC Pub. 5266 (Dec. 2021) .............................. 11

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China*,

   77 Fed. Reg. 73,018 (Dep't Commerce Dec. 7, 2012) ........................... 8

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*,

   77 Fed. Reg. 73,017 (Dep't Commerce Dec. 7, 2012) ........................... 8

*Ferrovanadium and Nitrided Vanadium From the Russian Federation*,

   77 Fed. Reg. 46,712 (Dep't Commerce Aug. 6, 2012) ............... 55

*Ferrovanadium and Nitrided Vanadium From the Russian Federation*,

   77 Fed. Reg. 6,537  (Dep't Commerce Feb. 8, 2012) ............. 51

*Hot-Rolled Lead and Bismuth Carbon Steel Products from Germany and the United Kingdom*,

   64 Fed. Reg. 40,336, 40,347 (Dep't Commerce July 26, 1999) ............ 66

*Small Diameter Graphic Electrodes from the People's Republic of China*,

   77 Fed. Reg. 33,405 (Dep't Commerce June 6, 2012) ........................ 52

## GLOSSARY

| Abbreviations | Term |
|---|---|
| AD/CVD | Antidumping and Countervailing Duty |
| A-SMACC | American Solar Manufacturers Against Chinese Circumvention |
| Auxin Circ. Req | Letter from Cassidy Levy Kent (USA) LLP to the U.S. Department of Commerce, *Crystalline Silicon Photovoltaic Cells, Whether Or Not Assembled Into Modules From The People's Republic Of China, Auxin Solar Placing Petition on Record*, Case Nos. A-570-979, C-570-980 (Anti-Circumvention Inquiry Concerning Malaysia, Vietnam, and Thailand) (Feb. 18, 2022) |
| Auxin | Auxin Solar Inc. |
| CSPV | Crystalline Silicon Photovoltaic |
| CSIL Prelim. Analysis Memo | Memorandum from Paola Aleman Ordaz and Jeffery Pedersen to The File, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic from China – Circumvention Inquiry with Respect to Thailand, Preliminary Analysis Memorandum for Canadian Solar International Limited*, Case Nos. A-570-979/ C-570-980 (Circumvention Inquiry Thailand 2022) (Dec. 1, 2022) |
| CSIL Verification Report | Memorandum from Paola Aleman Ordaz, Brittany Baur, and Spencer Neff to the File, *Circumvention Inquiry With Respect to the Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China, Verification of the Information Reported by Canadian Solar International Limited,* Case No. A-570-979 |

| Abbreviations | Term |
|---|---|
| | (Circumvention Inquiry Thailand 2022) (Apr. 19, 2023) |
| *Decision Memo* | Memorandum from James Maeder to Lisa Wang, Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China, *Issues and Decision Memorandum for the Circumvention Inquiry With Respect to Thailand*, Case Nos. A-570-979/C-570-980 (Circumvention Injury Thailand 2022) ( Aug. 17, 2023), |
| *Final Determination* | *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Scope Determination and Final Affirmative Determinations of Circumvention with Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 88 Fed. Reg. 57,419 (Dep't Commerce Aug. 23, 2023), |
| "Minor or insignificant" Factors | Statutory factors under 19 U.S.C. § 1677j(b)(2) |
| *Prelim Memo* | Memorandum from James Maeder to Lisa Wang, Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China, Preliminary Decision Memorandum for the Circumvention Inquiry With Respect to the Kingdom of Thailand, Case No. A-570-979 (Circumvention Inquiry Thailand 2022) (Dec. 1, 2022) |

| Abbreviations | Term |
|---|---|
| Q&V | Quantity and Value |
| R&D | Research and Development |
| *Solar I* Orders | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 77 Fed. Reg. 73018 (Dep't Commerce Dec. 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Countervailing Duty Order*, 77 Fed. Reg. 73,017 (Dep't Commerce Dec. 7, 2012) |
| TTL Prelim. Analysis Memo | Memorandum from Paola Aleman Ordaz and Jeffery Pedersen to The File, Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic from China – Circumvention Inquiry with Respect to Thailand, *Preliminary Analysis Memorandum for Trina Solar Science & Technology (Thailand) Ltd*, Case Nos. A-570-979, C-570-980 (Circumvention Inquiry Thailand 2022) (Dec. 1, 2022) |
| TTL Verification Report | Memorandum from Paola Aleman Ordaz, Brittany Baur, and Spencer Neff to the File, Circumvention Inquiry With Respect to the Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China, *Verification of the Information Reported by Trina Solar Science & Technology (Thailand) Co., Ltd.*, Case No. A-570-979 (Circumvention Inquiry Thailand 2022) (Apr. 19, 2023) |

## MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Plaintiffs Trina Solar Science & Technology (Thailand) Ltd. ("TTL") and Canadian Solar International Limited ("CSIL") and Canadian Solar Manufacturing (Thailand) Co., Ltd. ("THSM") (jointly "Canadian Solar") (collectively "Plaintiffs"), hereby jointly submit this Memorandum of Points and Authorities in Support of their Motion for Judgment on the Agency Record in accordance with Rule 56.2(c) of the Rules of this Court. Plaintiffs move jointly for judgment on the agency record, in accordance with this Court's February 13, 2024 Order consolidating the above-captioned cases for purposes of scheduling, briefing, and argument. ECF Nos. 30 (Ct. No. 23-222), 34 (Ct. No. 23-227).[1] For the reasons set forth below, Plaintiffs respectfully request that the Court reverse the challenged determination of the U.S. Department of Commerce ("Commerce" or the "Department"), and

---

[1]    Plaintiffs TTL, CSIL, and THSM file this Motion and Memorandum jointly in the interest of judicial efficiency and to avoid duplicative papers. CSIL and TTL were both mandatory respondents in the agency circumvention investigations. CSIL and THSM are Plaintiff-Intervenors in Ct. No. 23-227. ECF No. 29. TTL, Plaintiff in Ct. No. 23-227 has decided not to seek relief with regard to Count Three of Plaintiff TTL's Complaint. *See* Compl., Nov. 20, 2023, ECF Doc. No. 9 (23-227).

remand with instructions consistent with this Memorandum and the Court's findings.

As explained herein and demonstrated in the agency record, Canadian Solar and TTL are solar companies that have not circumvented the antidumping and countervailing ("AD/CVD") duty orders at issue in this proceeding. Rather, for many years, both Canadian Solar and Trina have operated transparently and diligently to follow the rules clarified repeatedly by Commerce until the agency's sudden change of course in the challenged determination. For the reasons set forth below, this case should be remanded so that the agency can correct its faulty findings of circumvention with respect to Canadian Solar and TTL.

# I.    STATEMENT PURSUANT TO RULE 56.2(C)

## A.    Administrative Determination Under Review

This action is an appeal from Commerce's Final Determination in *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Scope Determination and Final Affirmative Determinations of Circumvention with Respect to Cambodia,*

*Malaysia, Thailand, and Vietnam*, 88 Fed. Reg. 57,419 (Dep't Commerce Aug. 23, 2023), P.R. 596, Appx1225–1239 ("*Final Determination*") and accompanying Memorandum from James Maeder to Lisa Wang, Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China, *Issues and Decision Memorandum for the Circumvention Inquiry With Respect to Thailand*, Case Nos. A-570-979/C-570-980 (Circumvention Injury Thailand 2022) (Aug. 17, 2023), P.R. 595, Appx1056-1224 ("*Decision Memo*"), C.R. 290-293, Appx1240-1249.

## B.    Issues Presented

Plaintiffs respectfully request that this Court hold that the *Final Determination* is unsupported by substantial evidence and otherwise not in accordance with law, and that this Court remand the *Final Determination* with instructions to issue a new determination that is consistent with this Court's decision. Plaintiffs seek judgment on the agency record with respect to the following issues:

i.    **Whether Commerce's affirmative determination of circumvention in Thailand is supported by substantial evidence when Commerce found that four out of five (for TTL) and three out of five (for CSIL) of**

**the Minor or Insignificant Factors weighed *against* a finding of circumvention?**

No. Commerce determined that *four* out of the five factors under 19 U.S.C. § 1677j(b)(2) weighed *against* finding that TTL's cell and module production in Thailand was minor or insignificant, and that *three* of the five factors weighed *against* a finding of circumvention with respect to CSIL. *Decision Memo*, at 41-60, P.R. 595, Appx1096–1115. Commerce cannot promote one factor to supersede all others—and particularly not the R&D factor. On this basis alone, Commerce committed legal error in its circumvention determination with respect to Canadian Solar and TTL.

Commerce found that only one factor—the level of R&D—weighed *in favor* of finding circumvention with respect to TTL. This single factor was the premise for Commerce's finding that the entirety of TTL's process of assembly and completion in Thailand was minor or insignificant. *Id*. Commerce's elevation of this single factor over the other four factors contradicts its own finding that the nature of the production process in Thailand is significant. Likewise Commerce found that a majority of the "minor or insignificant" factors weighed *against* a finding of circumvention with respect to Canadian Solar, confirming the

4

company's massive investments and substantial production capabilities in Thailand but then elevating R&D over all other factors and disregarding record evidence of THSM's R&D activities.

Commerce's reasoning to place significant weight in the R&D factor is both illogical and erroneous. Therefore, Commerce's finding that TTL's and CSIL's production of cells and modules in Thailand is minor or insignificant under 19 U.S.C. § 1677j(b)(1)(C) is unsupported by substantial evidence and not in accordance with the law.

ii.    **Whether Commerce's findings with respect to research and development ("R&D") in Thailand are supported by substantial evidence and in accordance with law in particular because CSIL and TTL presented evidence of R&D?**

No. Commerce elevated R&D to be the determinative factor in the *Final Determination*, notwithstanding clear agency precedent that no factor is to be considered determinative. Commerce also failed to weigh record evidence demonstrating the very significant R&D undertaken by CSIL and TTL.

iii.    **Whether Commerce's findings with respect to the value of processing in Thailand for CSIL are supported by substantial evidence and otherwise in accordance with law when Commerce reached opposite outcomes in reliance on similar figures?**

5

No. The processes undertaken in Thailand by CSIL's Thai affiliate THSM to manufacture CSPV cells and modules are transformative in nature and thus add significant value. Moreover, Commerce acted arbitrarily in determining whether a particular value should be considered "small" in this analysis.

iv.     **Whether Commerce's affirmative determination of circumvention in Thailand is supported by substantial evidence when contrasted with Commerce's finding that the nature of production of crystalline silicon photovoltaic ("CSPV") cells and modules is significant and complex?**

No. In accordance with 19 U.S.C. § 1677j(b)(2)(C), Commerce found that the nature of the production process for CSPV cells and modules is an extensive, significant, and technologically advanced process. *Decision Memo* at 49–53, Appx1104–1108. Commerce determined, in comparison with ingot and wafer production, that the production of CSPV cells and modules involves more technological improvements, a greater number of workers, more production steps, a greater number of inputs, and a more extensive transformation. *Id*. Further, Commerce found that the production of CSPV cells requires "sophisticated, precise, and technologically advanced equipment" and "involves more than attaching Chinese components together." *Id*. at 52,

6

Appx1107. Notwithstanding, Commerce illogically concluded that the process of assembly or completion of CSPV cells and modules is "minor and insignificant." *Id*. at 65–68, Appx1120–1123. Commerce's conclusion is wholly incongruous with its detailed findings under 19 U.S.C. § 1677j(b)(1)(C), which found that the production of CSPV cells and modules involves significant (and not "insignificant"), extensive (and not "minor") processes. Commerce's affirmative finding of circumvention is therefore unsupported by substantial evidence.

>    **v.    Whether Commerce sufficiently demonstrated that an affirmative determination of circumvention was "appropriate," pursuant to the terms of the statute?**

No. The *Final Determination* fundamentally alters a decade of Commerce guidance instructing that the situs of the positive-negative ("p/n") junction imparts country of origin for AD/CVD purposes. The *Final Determination* offers no indication that Commerce adequately assessed the "appropriateness" of such an action as required by statute. 19 U.S.C. § 1677j(b)(1)(E),

## II.    STATEMENT OF FACTS

CSPV cells and modules have been subjected to multiple AD and CVD proceedings over the last twelve years. These proceedings, and

their corresponding scope clarifications, have oriented the global solar

supply chain in a manner that gives rise to key issues in the instant

appeal.

### A.    *Solar I* Orders

Commerce published AD/CVD orders on CSPV cells from China

and modules possessing CSPV cells from China in December 2012 (the

"*Solar I* Orders").[2] Most significantly, Commerce established critical

country-of-origin language through the *Solar I* proceedings, consistently

instructing that the country of formation of the p/n junction (wherein a

wafer[3] becomes a CSPV cell capable of converting sunlight into

electricity) determines the origin of the CSPV cell for AD/CVD scope

---

[2]    *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 77 Fed. Reg. 73,018 (Dep't Commerce Dec. 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Countervailing Duty Order*, 77 Fed. Reg. 73,017 (Dep't Commerce Dec. 7, 2012) (collectively, "*Solar I* Orders").

[3]    To form a CSPV cell, polysilicon is added with boron and heated to form monocrystalline silicon. *Decision Memo*, at 49, P.R. 595, Appx1104. After being further crystallized and cooled, the ingot is formed, which is subsequently sliced into thin "wafers." *Id*. The sliced wafers then undergo phosphorus diffusion, which gives the surface of the wafer its negative potential electrical orientation. *Id*. The phosphorus layer and a boron-doped layer together create the p/n junction of the cell. *Id*. The cell then undergoes additional chemical processes to enhance sunlight absorption before silver paste is soldered onto the cell to form electrical conduits. *Id*. After necessary testing, the completed CSPV cells are then ready to be assembled into solar modules. *Id*.

purposes.[4] The p/n junction is formed "once the wafer is doped and an

opposite electrical orientation is imparted on the surface. When

sunlight strikes the cell, the positive and negative charge carriers are

released, causing electrical current to flow. It is at this point that the

cell is capable of generating electricity from sunlight." *Decision Memo* at

52, Appx1107. For example, if the p/n junction of a CSPV cell is formed

in China, and the cell is subsequently sent to South Korea to be further

incorporated into a solar module, that CSPV cell will be subject to the

*Solar I* Orders because it contains a CSPV cell with the p/n junction

formed in China. Conversely, if a Chinese wafer is sent to South Korea,

where it is subsequently further processed into a CSPV cell, it would

fall outside the scope of the *Solar I* Orders because the p/n junction was

formed in South Korea—outside of China.

  In determining that the p/n junction formation was the significant

turning point for origin purposes, rather than an earlier process in

---

[4] *See* Letter from Akin Gump Strauss Hauer & Feld LLP, "NextEra Comments on Auxin's Circumvention Ruling Request," (May 2, 2022), at Attachment 13 (citing Commerce Memorandum, "Scope Clarification: Antidumping and Countervailing Duty Investigations of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China," (Mar. 19, 2012) ("*Scope Clarification Memo*")), P.R. 178, Appx21223, P.R. 179, Appx21507-Appx21516.

production, such as ingot slicing or wafer production, Commerce expressly rejected the *Solar I* petitioner's attempt to enlarge the scope of the Orders to include CSPV cells manufactured in third countries using Chinese wafers. Letter from Akin Gump Strauss Hauer & Feld LLP, "NextEra Comments on Auxin's Circumvention Ruling Request," (May 2, 2022), at Attachment 13 (citing Commerce Memorandum, "Scope Clarification," (Mar. 19, 2012)), at 6–8, P.R. 179, Appx21512– Appx21514. Commerce determined that solar cells produced in third countries using Chinese wafers (i.e., prior to the formation of the p/n junction) would be outside the scope of the investigation. *Id.* at 8–9, Appx21514–Appx21515. Further, in addressing country-of-origin issues, Commerce instructed the *Solar I* petitioner that wholly separate AD/CVD petitions would need to be filed to "address any dumping concerns it has regarding solar modules/panels assembled from solar cells produced in a third country." *Id.* at 9, Appx21515.

As such, the formation of the p/n junction has long been considered the transformative step in the production process of a solar cell, orienting entire global supply chains to comply with the Government's directive. For the last twelve years, the entire solar

10

industry, including producers both in the United States and abroad, has come to rely on this bright line in determining significant investment and development decisions. Similarly, the U.S. International Trade Commission and U.S. Customs and Border Protection have all consistently relied upon Commerce's determination that the p/n junction formation serves as the key origin turning point when enforcing and weighing scope and origin issues.[5]

## B.    *Solar II* Orders

On December 31, 2013, one year after the *Solar I* Orders were published, the same petitioner brought AD and CVD petitions against certain CSPV products from China, and simultaneously brough AD

---

[5]    *See, e.g.*, Memorandum from Daniel Alexander to James Maeder, *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells from the People's Republic of China: Sunspark Technology Inc. Scope Ruling*, Case Nos. A-570-979, C-570-980 (Oct. 23, 2020), P.R. 179, Appx21584–Appx21590; Commerce Memorandum, *Final Scope Ruling on the Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells from the People's Republic of China: ET Solar Inc.* (A-570-979, C-570-980) (June 15, 2021), P.R. 179, Appx21567–Appx21582; U.S. Customs and Border Protection, Ruling H301813 (May 24, 2019), C.R. 58, Appx5296-Appx5299; U.S. Customs and Border Protection, Ruling H301201 (Oct. 18, 2019), C.R. 46, Appx4173–Appx4176; *Crystalline Silicon Photovoltaic Cells and Modules From China*, Inv. Nos. 701-TA-481 and 731-TA-1190, USITC Pub. 4360 (Nov. 2012) (Final) at I-18, Appx22472; *Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products*, Inv. No. TA-201-75, USITC Pub. 5266 (Dec. 2021) (Extension) at I-58, I-82, P.R. 197, Appx22745, Appx22769 (Attachment 37-B); *Sunpreme Inc. v. United States*, 946 F.3d 1300 (Fed. Cir. 2020) (en banc).

petitions against certain CSPV products from Taiwan.[6] In this second solar case, the petitioner sought a remedy against solar module exports by CSPV module producers in China that had switched from using Chinese cells to using third-country cells, including from Taiwan, as such goods were outside the scope of the *Solar I* Orders.[7] Commerce subsequently issued AD/CVD orders on February 18, 2015 (the "*Solar II*" Orders).[8] These orders cover CSPV solar modules produced in China using cells produced outside of China.[9] The *Solar II* Orders also cover CSPV solar cells from Taiwan, wherever assembled into modules.

## C.  Circumvention Inquiries

On August 16, 2021, a group of anonymous entities calling itself the American Solar Manufacturers Against Chinese Circumvention ("A-SMACC") requested that Commerce initiate a company-specific

---

[6]     *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China*: *Final Determination of Sales at Less Than Fair Value*, 79 Fed. Reg. 76970 (Dep't Commerce Dec. 23, 2014) and accompanying Issues and Decision Memo, at 6.

[7]     *Id*. at 17–18.

[8]     *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Antidumping Duty Order; and Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order*, 80 Fed. Reg. 8592 (Dep't Commerce Feb. 18, 2015); *Certain Crystalline Silicon Photovoltaic Products From Taiwan: Antidumping Duty Order*, 80 Fed. Reg. 8,596 (Dep't Commerce Feb. 18, 2015).

[9]     *Id*. at 11–16.

circumvention inquiry regarding CSPV products from Malaysia,

Thailand, and Vietnam. Commerce rejected A-SMACC's request as

deficient and declined to initiate a circumvention inquiry on November

10, 2021. *See* Letter from Cassidy Levy Kent (USA) LLP to the U.S.

Department of Commerce, Crystalline Silicon Photovoltaic Cells,

Whether Or Not Assembled Into Modules From The People's Republic

Of China, *Auxin Solar Placing Petition on Record*, Case Nos. A-570-979,

C-570-980 (Anti-Circumvention Inquiry Concerning Malaysia, Vietnam,

and Thailand) (Feb. 18, 2022)) ("Auxin Circ. Req.") at 84, C.R. 2,

Appx1346.

On February 8, 2022, nearly a full decade after the *Solar I* Orders,

Auxin Solar Inc. ("Auxin"), a very small U.S. producer of solar modules

containing imported solar cells, requested that Commerce initiate

country-wide circumvention inquiries pursuant to 19 U.S.C. §

1677j(b)(1) to determine whether CSPV cells and modules completed in

Cambodia, Malaysia, Thailand, or Vietnam using parts and components

manufactured in China were circumventing the *Solar I* Orders. *See*

Auxin Circ. Req., C.R. 2–21,Appx1255, 1269. The circumvention

allegation affected over $5 billion of solar imports into the United

States, consisting of over 80 percent of imported CSPV products. *Id.* at Ex. 1, C.R. 3, Appx1360–Appx1386. Following this request, numerous interested parties explained that Commerce may not unlawfully expand the initial scope of the *Solar I* Orders through a circumvention proceeding to include non-Chinese cells, which it expressly excluded from scope of the Orders.[10] Despite the overwhelming opposition, Commerce initiated country-wide anti-circumvention inquiries on the *Solar I* Orders on April 1, 2022. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Initiation of Circumvention Inquiry on the Antidumping Duty and Countervailing Duty Orders*, 87 Fed. Reg. 19,071 (Dep't Commerce Apr. 1, 2022), P.R. 105, Appx20863–Appx20870.

---

[10]    *See e.g.*, Letter from Enel Green Power North America Inc to the U.S. Department of Commerce, Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China, *Request to Reject Anti-Circumvention Inquiries* (Mar. 4, 2022) "Request to Reject Anti-Circumvention Inquiries," at 3–8, P.R. 59, Appx20421–Appx20426; Memorandum from Paola Aleman Ordaz to the File, Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China, *Letter from Solar Energy Industries Association,* (Mar 8, 2022) "Letter from Solar Energy Industries Association," P.R. 65, Appx20473–Appx20476; Memorandum from Paola Aleman Orda to the File, Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China, *Letter from United State Senators,* (Mar. 11, 2022) "Letter from United State Senators" P.R. 82, Appx20543–Appx20547.

14

On May 12, 2022, Commerce selected two mandatory respondents for the Thailand segment of the circumvention inquiries—Trina Solar Science & Technology (Thailand) Ltd. and Canadian Solar International Limited. Memorandum from Jeff Pedersen and Paola Aleman Ordaz to Robert Bolling, *Circumvention Inquiry With Respect to Thailand: Respondent Selection,* (May 12, 2022), C.R. 79, Appx6817. TTL produces CSPV solar cells and modules at its facility in Rayong, Thailand. *See Verification of the Information Reported by Trina Solar Science & Technology (Thailand) Co. Ltd.*, (Apr. 19, 2023), C.R. 281, Appx19751, Appx19756. CSIL is a Hong Kong-based trading company that exports CSPV products, including CSPV solar cells and modules produced by its affiliate THSM, in Chonburi, Thailand. *See Verification of the Information Reported by Canadian Solar International Limited* (Apr. 19, 2023), C.R. 281, Appx19717, Appx19720. Commerce issued initial questionnaires to CSIL and TTL on May 13, 2022. Letter from the U.S. Department of Commerce to Canadian Solar International Limited, Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China, *Circumvention Inquiry Questionnaire*, (May 13, 2022), P.R. 214, Appx23766; Letter from the

U.S. Department of Commerce to Trina Solar Science & Technology

(Thailand) Ltd., Crystalline Silicon Photovoltaic Cells, Whether or Not

Assembled Into Modules, From the People's Republic of China,

*Circumvention Inquiry Questionnaire*(May 16, 2022), P.R. 225,

Appx23794. CSIL and TTL timely submitted fulsome questionnaire

responses from May 2022 through November 2022. Appx1212-1213;

Appx1222.

### D.    Preliminary Determination

On December 1, 2022, Commerce preliminarily determined that

imports of CSPV cells and modules exported from Cambodia, Malaysia,

Thailand, and Vietnam using parts and components from China are

circumventing the *Solar I* Orders under 19 U.S.C. § 1677j(b)(1).

*Antidumping and Countervailing Duty Orders on Crystalline Silicon*

*Photovoltaic Cells, Whether or Not Assembled Into Modules, from the*

*People's Republic of China: Preliminary Affirmative Determinations of*

*Circumvention with Respect to Cambodia, Malaysia, Thailand, and*

*Vietnam*, 87 Fed. Reg. 75221 (Dep't Commerce Dec. 8, 2022) ("*Prelim.*

*Determination*"), P.R. 503, Appx1027-Appx1037, and accompanying

Memorandum from James Maeder to Lisa Wang, Antidumping and

16

Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China, *Preliminary Decision Memorandum for the Circumvention Inquiry With Respect to the Kingdom of Thailand*, Case No. A-570-979 (Circumvention Inquiry Thailand 2022) (Dec. 1, 2022), ("*Prelim. Memo*"), P.R. 497, Appx1000–Appx1026.

As part of its preliminary determination, Commerce analyzed whether "the process of assembly or completion" in Thailand was "minor or insignificant." *See* 19 U.S.C. §§ 1677j(b)(1)(C), 1677j(b)(2). Specifically, for each respondent, Commerce weighed the five statutory factors under 19 U.S.C. § 1677j(b)(2): (A) the level of investment in the foreign country; (B) the level of research and development in the foreign country; (C) the nature of the production process in the foreign country; (D) the extent of production facilities in the foreign country; and (E) whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States ("minor or insignificant" factors). In applying this analysis, Commerce compared the production of CSPV cells and modules by the Thai respondents to the similarly situated of

their affiliated producers in China. *Prelim Memo* at 15, P.R. 497, Appx1014. Under Commerce practice, the statutory test requires a weighing and balancing of factors.

For TTL, Commerce found that four out of the five statutory factors under 19 U.S.C. § 1677j(b)(2) weighed *against* a finding of circumvention. *Id*. at 16-20, P.R. 497, Appx1015-Appx1021. For CSIL, Commerce found that three out of the five statutory factors weighed *against* a finding of circumvention. *Id*. Yet, Commerce ultimately concluded that both respondents were circumventing the *Solar I* Orders. *Id*. at 24, Appx1023. Commerce's finding in this regard – that circumvention was occurring notwithstanding a *majority* of the statutory factors weighing against a finding of circumvention – was without agency precedent and contrary to law.

### i. Preliminary Analysis of Minor or Insignificant Factors

**Level of Investment.** As for the first "minor or insignificant" factor, Commerce determined that the level of investment of both CSIL and TTL in Thailand was significant – even finding Thai investment to [                    ] Chinese investment. Memorandum from Paola Aleman Ordaz and Jeffery Pedersen to The File, Crystalline Silicon

Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic from China – Circumvention Inquiry with Respect to Thailand, *Preliminary Analysis Memorandum for Canadian Solar International Limited,* Case Nos. A-570-979/C-570-980 (Circumvention Inquiry Thailand 2022) (Dec 1. 2022) ("CSIL Prelim. Analysis Memo") at 2, C.R. 225, Appx1048. For TTL, Commerce compared TTL's total reported investment required to construct and start its solar cell and module production facilities, *i.e.*, [            ], to the total investment that was required to construct and start TTL's Chinese affiliates' wafer production, *i.e.*, [            ]. Memorandum from Paola Aleman Ordaz and Jeffery Pedersen to The File, Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic from China – Circumvention Inquiry with Respect to Thailand, *Preliminary Analysis Memorandum for Trina Solar Science & Technology (Thailand) Ltd*, Case Nos. A-570-979/C-570-980 (Circumvention Inquiry Thailand 2022) (Dec. 1, 2022) "(TTL Prelim. Analysis Memo"), at 2, C.R. 223, Appx1039. For CSIL, Commerce compared THSM's investment of [            ] in Thai cell and module manufacturing against the [            ] required to

19

construct and start up wafer production in China by its affiliates. CSIL Prelim. Analysis Memo, Appx1048. Based on this comparison, Commerce correctly determined that the level of investment in Thailand to produce solar cells and modules was not minor or insignificant for either respondent, and this level of investment weighed against a finding of circumvention. *Prelim Memo* at 16, Appx1015.

**Extent of Production Facilities.** For the "extent of production facilities" factor, Commerce compared the size, production capacity, and number of workers at each respondent's cell and module facilities in Thailand with each respondent's affiliated [                ] producing facilities in China. For TTL, Commerce found that its solar cell and module facilities in Thailand are [

                ] compared to its affiliate's [        ] factory in China, which indicates the extent of the production facilities in Thailand is not minor or insignificant. TTL Prelim. Analysis Memo at 2-3, Appx1039 –Appx1040. Similarly, for CSIL, Commerce found that the size of THSM's cell and module production facilities was [                ] to that of its affiliated [                ] production facilities in China, and that THSM [                ] the number of workers in

20

Thailand as compared to the workers in Chinese affiliates. CSIL

Prelim. Analysis Memo, Appx1049.

**Nature of Production Process.** For the "nature or production

process" factor, Commerce made a broad, "all-inclusive" finding as to

the significant nature of cell and module production in Thailand when

compared to ingot and wafer production in China:

> {R}elative to ingot and wafer production, solar cell
> and module production involves a greater number
> of stages, each requiring a high level of
> technological sophistication. Specifically, the
> process for turning wafers into solar cells
> requires an expensive, multi-stage assembly line
> requiring high-technological machinery and
> workers with strong technological knowledge.
> While ingot and wafer production require large
> amounts of upfront capital and technical
> capabilities, the ITC found solar cell production
> to be the "most capital intensive part of the
> manufacturing process," and "a highly
> automated, capital intensive, and technologically
> sophisticated process, requiring skilled
> technicians and employees with advanced
> degrees."
>
> Moreover, module production also involves a
> large number of varied inputs consumed in a
> complex, multi-step production process that
> requires precision, highly skilled workers, and
> accurate quality-testing equipment at multiple
> stages. Furthermore, the physical transformation
> of polysilicon rocks into wafers (*i.e.*, the portion of
> the production process occurring in China) is less

21

extensive than the transformation of wafers into solar modules (*i.e.*, the portion of the production process occurring in third countries). Only a handful of inputs are used to convert polysilicon rocks into wafers, whereas converting a solar cell into a solar module requires approximately 100 different inputs.

Additionally, Commerce previously noted that cell production is where the essence of a solar module is realized. Specifically, Commerce noted that once a wafer is doped and an opposite electrical orientation is imparted on the surface, it results in the creation of a p/n junction. When sunlight strikes the cell, the positive and negative charge carriers are released, causing electrical current to flow. It is at this point that the cell is capable of generating electricity from sunlight.

Therefore, Commerce has determined that it is only when the p/n junction is created that a wafer is no longer just a wafer, but is a solar cell that is subject to the *Orders*. Commerce also noted in the underlying investigation that, "{t}he essential component of solar modules/panels is the solar cell since the purpose of solar modules/panels is to convert sunlight into electricity and this process occurs in the solar cells." . . .

Thus, we find that the nature of the production performed by the respondents in the third country is not minor or insignificant compared to either processing polysilicon into wafers, or ingots into wafers, in China, which does not weigh in favor of finding circumvention.

*Prelim. Memo* at 19–20, Appx1018–1019.

22

Commerce notably made the same determination that the nature of cell and module production is *not* a minor or insignificant process in all four segments of the circumvention inquiries. *Prelim. Memo* at 17–20, Appx 1016–1019.

**Level of R&D.** For the "level of research and development" factor, Commerce found that neither TTL's nor CSIL's R&D expenditures in Thailand was significant when compared to R&D expenditures in ingot and wafer production made by each company's affiliates in China. Appx1015. For CSIL, Commerce compared THSM's R&D costs incurred from 2019 through 2021 related to cell and module production (**[**

**]**) against those incurred by **[        ]** ingot and wafer producers (**[                    ]**). CSIL Prelim. Analysis Memo, Appx1048. For TTL, Commerce found that TTL did not incur any R&D expenses from 2019 through 2021. TTL Prelim. Analysis Memo, Appx1039. Commerce compared this window of R&D expenses from TTL to those reported by its Chinese affiliates from 2015 through 2021, calculated by Commerce to be over **[        ]**. *Id.* at Att. III, C.R. 224, Appx1046. Commerce asserted that TTL "relied on its affiliates in

China to improve technologies and keep its production process and products up to date with changing technology." *Id*. at 2, Appx1039.

**Value of Processing.** Finally, for the last statutory factor, Commerce analyzed whether the value of the processing performed in Thailand represents a small proportion of the value of the merchandise imported into the United States. Commerce summed the per-unit costs incurred in the third country for non-Chinese material inputs, labor, fixed and variable overhead, selling, general, and administrative items, and interest, and divided the sum by the per-unit weighted-average value of the respondents' U.S. sales of inquiry merchandise during 2021. Based on Commerce's calculations, the value of processing performed by TTL in Thailand was **[        ]**% of the value of inquiry merchandise imported into the United States in 2021. Appx1040. Commerce determined that this was a significant percentage of value which weighed against finding circumvention. Appx1040. For CSIL, Commerce conducted a similar analysis, finding the value of processing performed by CSIL in Thailand to be **[        ]**% of the value of the inquiry merchandise imported into the United States in 2021. Appx1049. Commerce found this value to weigh in favor of

circumvention for CSIL, but Commerce offered no analysis or explanation supporting these disparate conclusions with respect to CSIL and TTL.

### E.    Final Determination

On August 23, 2023, following extensive briefing by respondents, Commerce published its *Final Determination* in the *Federal Register*. Commerce did not change its circumvention analysis as to TTL or CSIL. *Decision Memo* at 1, Appx1056. TTL and CSIL both timely raised arguments concerning, among other issues, Commerce's purported analysis of the level of R&D, nature of the production process, and value of processing under 19 U.S.C. § 1677j(b)(2).

For the level of R&D in Thailand, TTL argued that this single factor alone cannot support Commerce's affirmative circumvention finding. *See* Case Brief from Trade Pacific PLLC, Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China, *TTL's Second Tranche Case Brief,* Case Nos. A-570-979/C-570-980 (Anti-Circumvention Inquiry (Thailand 2022)) (Apr. 26, 2023), C.R. 282, Appx19787-19820. More specifically, TTL noted that Commerce's on-site verification report stated that, "company

officials explained that TTL did incur R&D expenses from 2019 through 2021 and that they recorded R&D expenses in the Oracle system under a general account, rather than in a R&D expense account." TTL Verification Report at 14, C.R. 281, Appx19763. However, Commerce declined to accept any documentation presented by TTL to support this claim as a verification exhibit because Commerce found this claim to be new factual information. In the *Final Determination*, Commerce did not make any company-specific findings as to TTL's level of R&D in Thailand, despite being presented with information of such expenses at verification. *Id*. at 14, C.R. 281, Appx19763. Instead, Commerce explained that R&D should be weighed more heavily over other factors given its significance within the solar industry. *Decision Memo* at 65, P.R. 595, Appx1120.

Prior to the *Final Determination*, CSIL likewise demonstrated in its case brief that Commerce had improperly elevated the importance of the single R&D factor above all others, contrary to the agency's own precedent. Appx19847-19848. CSIL further explained that Commerce failed to address the nature of THSM's R&D activities in Thailand, the number of employees involved in THSM's R&D activities, and the

relative weight of R&D activities compared to the size of total operations. CSIL's Second Tranche Case Brief, C.R. 283, Appx19849. Notwithstanding CSIL's demonstration of the significant R&D undertaken by THSM in Thailand, Commerce continued to find that this factor weighed in favor of a finding of circumvention. *Decision Memo* at 44, Appx1099.

CSIL similarly timely explained that the record demonstrated that the value of processing performed by THSM in Thailand was significant. In particular, CSIL explained that Commerce had erroneously focused solely on a quantitative, value-added analysis, without a broader view of the production process. CSIL's Second Tranche Case Brief at 19, Appx19851. Moreover, **[       ]**% of the value manufactured in Thailand does not constitute a small proportion. *Id*. Even a narrow focus on value-added numbers should have weighed in favor of a negative determination. Notwithstanding CSIL's explanation, Commerce continued to find this factor to weigh in favor of a finding of circumvention with respect to CSIL. *Decision Memo* at 57-60, Appx1112-Appx1115.

Critically, Commerce did not modify its analysis of the "nature of the production process" factor from the Preliminary Determination, and it continued to recognize that production of CSPV cells and modules involves "significant," "extensive" processes. *Decision Memo* at 49, 53, Appx1104, Appx1108.

Accordingly, although Commerce continued to find that four out of five (for TTL) and three out of five (for CSIL) of the minor or insignificant factors weighed against a finding of circumvention, Commerce did not change its determination that CSPV cells and modules produced in Thailand using parts and components manufactured in China and exported to the United States were circumventing the *Solar I* Orders. *Decision Memo*, Appx1056.

## III. STANDARD OF REVIEW

In reviewing a challenge to Commerce's determination in a circumvention inquiry, the Court "shall hold unlawful any determination, finding, or conclusion found. . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with the law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 477 (1951). It must be "more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established." *N.L.R.B. v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939). The Court "looks to the record as a whole, including any evidence that fairly detracts from the substantiality of the evidence," *Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1323 (Fed. Cir. 2010) (internal quotation marks and citation omitted), and determines "whether the evidence and reasonable inferences from the record support {the agency's} finding." *Daewoo Elecs. Co. v. Int'l Union of Elec., Tech., Salaried & Mach. Workers, AFL-CIO*, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (internal quotation marks and citation omitted). Commerce must provide a "rational connection between the facts found and the choice made," *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962), and "examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 30 (1983).

Commerce is also required by law to include in its final determination "an explanation of the basis for its determination that

addresses relevant arguments{ } made by interested parties who are parties to the investigation or review." 19 U.S.C. § 1677f(i)(3)(A). *See also NMB Sing. Ltd.* v. *United States,* 557 F.3d 1316, 1319 (Fed. Cir. 2009). Further, the Court will not sustain Commerce's determination when Commerce failed to address a party's relevant argument. *See Nucor Corporation v. United States*, 461 F. Supp. 3d 1374, 1380 (Ct. Int'l Trade 2020) (*citing Stein Industries Inc. v. United States*, 365 F. Supp. 3d 1364, 1371 (Ct. Int'l Trade 2019).

## IV. ARGUMENT

Both Canadian Solar and TTL engage in meaningful and significant production of CSPV solar cells and modules in Thailand. They have invested hundreds of millions of dollars in advanced facilities, employ sophisticated machinery and personnel, and perform the most important step (as repeatedly recognized by Commerce) in the solar production process – formation of the p/n junction – in Thailand. The *Final Determination* acknowledges these key truths but contradictorily finds that CSIL and TTL circumvented the *Solar I* Orders. The *Final Determination* is not supported by substantial evidence or otherwise in accordance with law because it (A) wrongly

finds CSIL's and TTL's production to be minor or insignificant in accordance with 19 U.S.C. § 1677j(b)(2), and (B) fails to demonstrate its appropriateness, as required by the governing statute.

CSIL's and TTL's operations are not minor or insignificant due to the following:

(1) a majority of the statutory factors weigh against a minor or insignificant finding in each case;

(2) Commerce's findings with respect to R&D ignore relevant agency precedent and record evidence;

(3) the value of processing that THSM undertakes in Thailand is significant; and

(4) the nature of the production process and other statutory factors make clear that CSIL's and TTL's operations do not constitute circumvention.

Moreover, Commerce failed to explain why an affirmative circumvention finding is "appropriate," as required by the terms of the statute, particularly when manufacturers have acted in reliance on Commerce's longstanding instructions regarding the primacy of the formation of the p/n junction.

A.   **The Statutory Criteria Weigh Heavily in Favor of Finding that Each of TTL's and CSIL's Production of Cells and Modules in Thailand Is Not Minor or Insignificant**

Commerce determined that *four* out of the five factors under 19 U.S.C. § 1677j(b)(2) weighed *against* a finding of circumvention for TTL, and that *three* out five factors weighed *against* a finding of circumvention for CSIL. *Decision Memo* at 39–68, Appx1094–Appx1123. Yet, despite these findings, Commerce concluded that both respondents were circumventing the orders. Commerce's conclusion that circumvention was occurring is not supported by its analysis of the minor or insignificant factors.

In order to expand the scope of existing AD/CVD orders through a finding of circumvention via third-country processing, Commerce must determine that *every statutory element* under 19 U.S.C. § 1677j(b)(1) has been met (emphases added below):

(A)   Whether the merchandise imported into the United States from Cambodia, Malaysia, Thailand, and Vietnam is the same class or kind as merchandise that is subject to the Orders;

(B)   Whether before importation into the United States, such merchandise is completed or assembled in a third country from merchandise that is subject to the Orders or produced with inputs from the country under the Orders;

(C)    Whether the process of assembly or completion in the third country is *minor or insignificant*;

(D)    Whether the value of the merchandise produced in the country subject to the Orders is a significant portion of the total value of the merchandise exported to the United States; *and*

(E)    Whether the action is *appropriate* to prevent evasion of the Orders.

Given the use of the conjunction "and," if even one of the above statutory elements is missing, Commerce may not reach an affirmative finding of circumvention. Often, the third statutory element, 19 U.S.C. § 1677j(b)(1)(C), whether the process of assembly or completion is minor or significant, is the most fact intensive. To aid Commerce in making its findings on that factor, the statute further provides five factors that Commerce must consider and weigh in determining whether processing in the third country is minor or insignificant:

(A)    the level of investment in the foreign country,

(B)    the level of research and development in the foreign country,

(C)    the nature of the production process in the foreign country,

(D)    the extent of production facilities in the foreign country, and

(E)    whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States.

33

19 U.S.C. §1677j(b)(2). The Statement of Administrative Action ("SAA") of the Uruguay Round Agreements Act explains that "no single factor {under § 1677j(b)(2)} will be controlling."[11] Accordingly, Commerce's practice has been to evaluate each factor as it exists in the third country and to consider the totality of its analysis of such factors when making a determination. *Prelim Memo* at 16, Appx1015.

Notwithstanding the plain text of the governing statute, the legislative history, and the agency's own practice, Commerce elevated the R&D factor above all other considerations and based its finding that TTL's processing is "minor or insignificant" on that single factor. For Canadian Solar, Commerce similarly elevated R&D over the level of investment, nature of the production process, and extent of production facilities. Not only does Commerce's finding conflict with the guidance in the SAA, it also contradicts Commerce's past decisions where it determined that a production process in a third country or in the United States was minor or insignificant. Commerce has *never* found a process

---

[11]    Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316 (1994) ("SAA"), at 893.

to be minor or insignificant when less than a majority of the five factors weighed in favor of finding the process to be minor or insignificant.

It is a bedrock principle of administrative law that an agency interpretation should not receive deference by a court when that agency interpretation conflicts with a prior interpretation and "creates 'unfair surprise' to regulated parties." *Kisor v. Wilkie*, 588 U.S. 558, 579 (2019) (quoting *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 170 (2007)). Such agency actions do not reflect the "fair and considered judgment" of the agency. *Kisor*, 588 U.S. at 579. The Court of International Trade has explained that an unexplained inconsistency in the application of an agency's methodology in the context of an adjudication is unlawful agency action. *Liberty Frozen Foods Pvt., Ltd. v. United States*, 731 F.Supp.2d 1249, 1256 (Ct. Int'l Trade 2011) (citing *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001)). Accordingly, because Commerce failed to evaluate each of the factors and consider the totality of its analysis of such factors, or to otherwise explain its departure from the methodology set forth in the statute, the *Final Determination* is an unlawful agency action.

In the underlying inquiry, Plaintiffs provided a summary of Commerce decisions since 2012 where Commerce determined that circumvention was occurring by minor processing either for merchandise completed in the United States or merchandise completed in a third country. *See* TTL's Second Tranche Case Brief, C.R. 283. Appx19787–19820. Plaintiffs identified eighteen decisions and summarized Commerce's findings with regard to each of the five factors considered. *Id.*; Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China, *Second Tranche Rebuttal Case Brief of Canadian Solar International Limited*, Case No. A-570-979 (Anti-Circumvention Inquiry Thailand-2022) (May 9, 2023) at 27–28, C.R. 287, Appx20074–Appx20075 (surveying five recent "minor or insignificant" findings). For fifteen of those eighteen decisions, Commerce found that all five factors weighed in favor of finding the process to be minor or insignificant. For the remaining three of those eighteen decisions, Commerce found that four of the five factors weighed in favor of finding the process to be minor or insignificant. Thus, those decisions demonstrated that Commerce has never found a process to be minor or insignificant when less than a majority of the five

factors weighed in favor of finding the process to be minor or insignificant. (In response, Petitioner identified *one* case where three of five factors—still a majority of the factors—weighed in favor of circumvention, and Commerce found circumvention. *Prelim. Memo*, P.R. 595, Appx1118.). In sum, Commerce has *always* justified affirmative circumvention determinations with a finding that the majority of the five factors weigh in favor of circumvention. Petitioner and the agency have not supplied any contrary precedent to this longstanding and consistent approach to the five factors.

The common sense embodied in Commerce's prior determinations and summarized in Attachment 1 of TTL's brief cannot be ignored. In TTL's case, Commerce found only one of the five factors weighed in favor of a circumvention finding. In CSIL's case, Commerce found only two of the five factors weighed in favor of a circumvention finding. This is not a majority. Thus, Commerce's decision cannot be supported by substantial evidence because there is no "rational connection between the facts accepted and the determination made." *Coalition of Am. Flange Producers v. United States*, 517 F. Supp. 3d 1378, 1381 (Ct. Int'l

Trade 2021) (citing *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Moreover, Commerce's conclusions are also inconsistent with the agency's findings in other segments of the circumvention inquiry—notably, Commerce's *negative* circumvention determination with respect to Jinko Solar Technology Sdn. Bhd. and Jinko Solar (Malaysia) Sdn. Bhd. (collectively, "Jinko") despite also finding that *four* out of the five factors under 19 U.S.C. § 1677j(b)(2) weighed against a finding of circumvention. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*, 88 Fed. Reg. 57,419 (Dep't Commerce Aug. 23, 2023) (final scope determination and final affirmative determinations of circumvention with respect to Cambodia, Malaysia, Thailand, and Vietnam) and accompanying Issues and Decision Memorandum (Malaysia) at 50 (". . . we continue to find the extent of Jinko's Malaysian production facilities to be minor or insignificant. . . ."). For Jinko, Commerce rendered a negative determination because a majority of the factors weighed against a finding of circumvention, inexplicably the opposite outcome of what Commerce reached with respect to TTL and CSIL. This inconsistency

makes clear that Commerce rendered its minor or insignificant

determination absent substantial evidence and contrary to law.

**B.    Commerce Acted Contrary to Law by Elevating the R&D Factor Over All Other Factors and Ignored Substantial Evidence of Significant R&D Undertaken in Thailand**

Notwithstanding the statute's directive to assess and weigh the

five factors, Commerce made one of those five factors – R&D –

determinative. This was contrary to law, and Commerce's finding with

respect to R&D also was not supported by substantial evidence.

**i.    Commerce Failed to Explain its Unreasonable Decision to Elevate the R&D Factor Above All Other Factors**

Commerce effectively placed dispositive weight on the R&D factor

in determining, despite its finding that the majority of the factors

weighed against circumvention, that the process or assembly of

completion in Thailand was not minor or insignificant. Commerce

explained that "{w}hile our decision weighed R&D heavily, it also took

into consideration the other four factors under {19 U.S.C. §1677j(b)(2)}."

*Decision Memo* at 65–68, Appx1120–Appx1123. Commerce failed to

provide any explanation for why those factors should not be accorded

their due weight. Instead, failing to address the record evidence,

39

Commerce asserts broad, inaccurate findings as to the solar industry as a whole to support its decision to disregard the other "minor or insignificant" statutory factors.

As a threshold matter, Commerce states that R&D has "preeminent importance in the solar industry," which is "the main reason R&D weighs heavily in the overall decision pursuant to {19 U.S.C. §1677j(b)(1)(C)}." *Id*. at 65, Appx1120. In support of this assertion, Commerce cites the R&D expenses reported by solar producers and their need to upgrade cell technology for efficiency. *Id*. Neither of these activities is unusual or unique to the solar industry, however, as many other manufacturing industries invest in R&D in order to become more efficient.

Next, Commerce contradicts itself, including its findings regarding the significant nature of the solar cell and module production process, by claiming that R&D expenses in *solar cells and modules* are not as important or significant when compared to R&D expenditures for wafer and polysilicon production. *Id*. Commerce offers no factual support for this claim. In fact, just one paragraph earlier, Commerce explains that "large *module makers* have been regularly upgrading their production

lines to adjust for new *cell structures* and other technological needs."
*Id.* at 65–66, Appx1120–1121 (emphasis added).

At their core, however, Commerce's industry findings as to the
significance of R&D expenditures directly contravene its findings as to
the significant nature of the solar cell and module production process.
Commerce observes that "wafer factories require high upfront capital
expenditure and bear many technical hurdles. . . {and} cell
manufacturing is more versatile compared to wafers and polysilicon and
has lower technical hurdles." *Id.* This was wrong. Commerce contradicts
its own findings as follows:

- "Record evidence indicates that there are significant technical
  requirements that must be met for, and changing technologies
  with respect to, producing solar cells." *Id.* at 50, Appx1105.

- "The equipment and technology, as well as the number of
  processing steps required to produce a solar cell are far more
  technically sophisticated than those of the polysilicon or wafer
  manufacturing operations. . . Cell manufacturing alone
  requires a fully integrated, multi-step manufacturing line with
  equipment to perform multiple processes. . . Each of these
  processes requires one or more uniquely designed and
  calibrated machines to advance the wafer from a commodity
  product to a finished cell." *Id.* at 51, Appx1106.

- "Moreover, while the technology required to produce ingots has
  not significantly changed since it was created, the same is not
  true for solar cells. Technology improvements in the wafer-to-

> cell process are responsible for most of the performance
> improvements of solar panels." *Id.* (internal quotation omitted).

Not only are these findings inconsistent with Commerce's overall

finding dismissing the importance of R&D conducted in Thailand,

where the cells are produced, they also directly contradict Commerce

precedent. The Department has previously explained that limited R&D

alone is an insufficient basis for an affirmative circumvention

determination—in fact, Commerce has explained that typically R&D

should be given less weight than the other statutory factors. For

instance, Commerce has explained that:

- "A lack of research and development expenses does not necessarily mean that circumvention exists," *Certain Welded Carbon Steel Standard Pipes and Tubes from India,* 87 Fed. Reg. 52,507 (Dep't Commerce Aug. 26, 2022) (preliminary negative determinations of circumvention of the antidumping order) and accompanying Issues and Decision Memorandum at 16 (unchanged in final).

- "A lack of research and development expenses . . . provides no information as an informative factor in determining whether the Order is being circumvented," *Id.* and

- A "lack of significant R&D expenses . . . is not informative in determining whether processing in {the third country} is minor or insignificant." *Light-Walled Welded Rectangular Carbon Steel Tubing from Taiwan*, 88 Fed. Reg. 21,980 (Dep't Commerce Apr. 12, 2023) (preliminary affirmative determination of circumvention of the antidumping duty order) and accompanying Issues and Decision Memorandum at 14.

Moreover, Commerce has repeatedly asserted that the level of R&D is *less* informative in determining whether third-country processing is "minor or insignificant" than the other statutory factors under section 781(b)(2). For example, in *Certain Aluminum Foil from the People's Republic of China*, Commerce explained as follows:

> The factors involving the level of investment, *the level of R&D*, and the extent of the production facilities in {the third country} weigh less heavily in our determination than the factors involving the nature of the production process and the value added in {the third country} because the former relate more broadly to the companies and their facilities, whereas the latter relate more to the production of the inquiry merchandise itself.

88 Fed. Reg. 17,177 (Dep't Commerce Mar. 22, 2023) (preliminary affirmative determinations of circumvention with respect to the Republic of Korea and the Kingdom of Thailand) and accompanying Issues and Decision Memorandum (Korea) at 15 (emphasis added). Commerce thus elevated R&D above all over factors and made it determinative, contradicting agency precedent establishing that (1) circumvention does not exist if a majority of the factors weigh against a finding of circumvention, and (2) R&D is a comparatively less important "minor or significant" factor.

Finally, in justifying its over-reliance on the R&D factor, Commerce directly contradicts its prior findings on the other four "minor and insignificant" factors:

> While four out of the five factors in the case of TTL and three of the five factors in the case of THSM do not support circumvention, these factors are still a function of the activities of TTL and THSM's affiliates in China. The financial statements of both respondents indicate that their major or ultimate decisions are made in their headquarters location in China. Further, for both CSIL and TTL we find that nearly all or all of the investment necessary to operate the factories was arranged by and was a function of actions by their affiliates in China. While many of the parts included in the value of processing done in the inquiry countries were sourced locally, as noted above, all or nearly all of the key high tech inputs of wafers and the other six most important inputs were produced in China.

*Decision Memo* at 66–67, Appx1121–1122. Commerce's reasoning is circular. First, it assessed each "minor or insignificant" factor by comparing activities of the respondents in Thailand to that of their affiliates based in China. For example, the level of investment in Thailand was found to be significant when compared to the level of investment by the respective affiliates. Yet, in explaining why these factors should not be as important as the R&D factor, Commerce

44

entirely disregarded its prior findings that the respondents' level of investment, extent of production facilities, and nature of processing *compared to that of its affiliates* is significant. The mere fact that respondents have affiliates in China cannot be used as a basis to unravel Commerce's findings that respondents' process of assembly or completion in Thailand was significant. In other words, Commerce cannot reasonably adopt an affiliate-centric analysis for weighing the minor and insignificant factors, and then rely on the existence of affiliates as reason to find circumvention.

Commerce's focus on the location of "major or ultimate decisions" is also notable because this is *not* one of the five "minor or insignificant" factors. Appx1121–1122. The statute requires Commerce to assess "the process of assembly or completion" in Thailand, rather than the individuals involved in making business decisions. Even so, Commerce's assertion regarding the location of business decisions is speculative. The record evidence demonstrates that this "process of assembly" is substantial, notwithstanding this new and irrelevant factor proposed by the agency.

45

### ii.  Commerce Failed to Engage with Substantial Evidence That Demonstrates Significant R&D in Thailand

Commerce's finding that THSM's R&D is not sufficient is also not supported by substantial evidence. Specifically, Commerce failed to account for record evidence detailing THSM's R&D activities, including that THSM employs skilled engineers who innovate on a daily basis to improve product and manufacturing efficiency and innovate on a daily basis. *CSIL Response to Circumvention Inquiry Questionnaire*, Case No. A-570-979 (Anti-Circumvention Inquiry Thailand–2022) (June 3, 2022) at Ex. 20, C.R. 133, Appx10734–Appx10735. Commerce confirmed R&D activities and initiatives at verification, including that THSM dedicated

[                          ] specifically to R&D projects in 2019, [

] in 2020, and [                          ] in 2021, and reviewed information regarding products developed specifically by THSM for solar cell and module production in Thailand. *CSIL Verification Exhibits*, C.R. 255 (Feb. 22, 2023), Appx18669–Appx18706; *CSIL Verification Report*, (Apr. 19, 2023) at 14, C.R. 280, Appx19729.

First, Commerce failed to address the nature of THSM's R&D activities in Thailand. The record evidence demonstrates that THSM's

technology team and process team each conduct R&D and develop new technologies to optimize THSM's own production and improve product quality. CSIL Initial Questionnaire Response ("IQR") at 7–8, C.R. 109, Appx8680–Appx8681. These efforts include, for example, **[**

**].** *Id.* at Ex. 20, C.R. 133, Appx10734-Appx10735. THSM also provided extensive evidence related to R&D initiatives designed, in part, to **[**

**].** *Id.* Commerce verified these initiatives, confirming that THSM had several "recent R&D projects." CSIL Verification Report, C.R. 280, Appx19729. Second, THSM demonstrated that it maintains **[    ]** employees across its Thailand cell and modules operations who work in R&D—a significant proportion of the total Canadian Solar workforce involved in R&D in Canadian Solar's global operations. CSIL IQR, Part I at. at Ex. 20, C.R. 133, Appx10734–Appx10735; *see also*, *id*. at Ex. 1-A (2021 Form 20-F)

47

at 96 (listing 156 full-time R&D employees across the subsidiaries of Canadian Solar Inc.), C.R. 109, Appx8801.

Put simply, THSM provided information demonstrating its significant R&D activities. Commerce simply refused to engage with this information in the *Final Determination*, merely asserting: "CSIL never compared the level of importance of the Thai R&D activities to the level of importance of the R&D activities of its affiliates in China to support it position." *Decision Memo* at 44, Appx1099. This is not reasonable decisionmaking. Rather, Commerce simply sidesteps the substantial evidence of THSM's R&D, including its activities and the number of employees. Moreover, even if R&D expenses in China are greater than in Thailand, Thai R&D expenses are still relevant to how much in favor that factor supports a finding of circumvention and how Commerce considers the totality of the circumstances under its "minor or insignificant" analysis. The *Decision Memo* fails to explain this weighing and thus falls short of the statute's directive. This is another reason that Commerce's finding with respect to R&D must be remanded.

PUBLIC VERSION

In rendering its findings with respect to R&D, Commerce thus (1) inappropriately elevated this one single factor to be determinative above the four other factors, (2) inexplicably contradicted its own precedent contextualizing the relative importance of R&D, and (3) failed to engage with record evidence demonstrating R&D conducted in Thailand.

### C.    Commerce's Findings Regarding the Value of Processing Performed in Thailand Are Arbitrary and Inexplicably Ignore Agency Precedent

In its *Final Determination*, Commerce determines that the percentage of the value of imported inquiry merchandise represented by THSM's processing in Thailand was a "small proportion" and thus "minor or insignificant." Appx1112, Appx1242. This finding is not supported by substantial evidence. In fact, on the contrary, the *Final Determination* acknowledges that the value of processing performed by CSIL in Thailand amounted to **[         ]**% of the value of the inquiry merchandise imported into the United States. Appx1242.

Commerce's determination is flawed in two respects. First, Commerce wrongly focused solely on a quantitative, value-added analysis, failing to take into account the qualitative element of THSM's

49

significant production processes in Thailand. Second, **[        ]**% of the value manufactured in Thailand is not a small proportion. As such, even a narrowly focused analysis of THSM's value-add should have weighed in favor of a negative determination on this factor.

### i. Commerce Failed to Conduct the Required Qualitative Value-Added Analysis

The statute directs Commerce to determine whether the value of the processing performed in the third country represents a small proportion of the value of the merchandise imported into the United States. 19 U.S.C. § 1677j(b)(2)(E). "Congress has directed {the Department} to focus more on the nature of the production process and less on the difference in value between the subject merchandise and the parts and components imported into the processing country."[12] Therefore, in conducting the value-added analysis, the agency shall not conduct only a comparison between the value of the

---

[12]     *See* Letter from Akin Gump Strauss Hauer & Feld LLP to the Department, *NextEra Comments on Auxin's Circumvention Ruling Request*, Case Nos. A-570-979 (Anti-circumvention Inquiries, Cambodia–2022, Malaysia–2022, Thailand–2022, Vietnam–2022) (May 2, 2022) ("NextEra Ruling Req. Cmts.") at n.135, Attach. 36-D (*citing Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates*, 80 Fed. Reg. 26,229 (Dep't Commerce May 7, 2015) (preliminary negative determination of circumvention of the antidumping order), and accompanying Issues and Decision Memorandum at 7), P.R. 179, Appx21251.

subject merchandise and the value of the relevant inputs in analyzing whether circumvention has occurred. Instead, Congress has instructed Commerce to adopt "a more qualitative focus on the nature of the production process," rather than "a rigid numerical calculation of value-added." SAA at 893. Moreover, in past circumvention cases and consistent with Congressional intent, circumvention inquiries "focus more on the nature of the production process and less on the difference in value between the subject merchandise and the imported parts or components." *Hot-Rolled Lead and Bismuth Carbon Steel Products from Germany and the United Kingdom*, 64 Fed. Reg. 40,336, 40,347 (Dep't Commerce July 26, 1999) (negative final determinations of circumvention of antidumping and countervailing duty orders); *see also Certain Corrosion-Resistant Steel Products from Taiwan*, 84 Fed. Reg. 32,864 (Dep't Commerce July 10, 2019) (affirmative preliminary determination of anti-circumvention inquiry on the antidumping duty order) and accompanying Issues and Decision Memorandum. Specifically, under the governing statute, the Department has explained that Congress has redirected Commerce's focus to the *nature* of the production process. *See Small Diameter Graphic Electrodes from the*

51

*People's Republic of China,* 77 Fed. Reg. 33,405, 33,413 (Dep't

Commerce June 6, 2012) (affirmative preliminary determination of

circumvention of the antidumping duty order and extension of final

determination); *Certain Pasta from Italy*, 68 Fed. Reg. 46,571, 46,575

(Dep't Commerce Aug. 6, 2003) (affirmative final determinations of

circumvention of antidumping and countervailing duty orders)

(unchanged in *Certain Pasta from Italy*, 68 Fed. Reg. 54,888 (Dep't

Commerce Sept. 19, 2003) (affirmative final determinations of

circumvention of antidumping and countervailing duty orders)).

The "essential" nature of CSIL's CSPV production processes is

conducted in Thailand. Accounting for the nature of the production

process, the value added by THSM is not "small." In fact, Commerce

conclusively found that the nature of THSM's production process in

Thailand is extensive and significant, showing that, qualitatively, the

value added through cell and module production in Thailand is

certainly significant. The manufacturing processes that occur in

Thailand completely change the relevant merchandise: a wafer cannot

produce electricity until it is transformed into a cell, and a cell is of

relatively little use until it is turned into a module. Commerce

examined the third-country production processes in this case and plainly and repeatedly found those "significant" activities to be "multi-stage," "technologically sophisticated," "capital intensive," processes, requiring "highly-skilled workers" and "skilled technicians and employees with advanced degrees"—and thus *not* "minor or insignificant" processes. *Decision Memo*, Appx1111, Appx1017 – Appx1018. These findings go to the heart of Commerce's inquiry into whether the process of assembly or completion in the foreign country is "minor or insignificant."

The *Final Determination* takes the position that its value-added determination should be quantitatively-focused because the overall circumvention determination is oriented to the *nature* of the production process. The *Decision Memo* observes:

> Congress then explained that it was amending 'sections 781(a) and (b) to shift the focus of the anticircumvention inquiry away from a test of the difference in value between the subject merchandise and the imported parts or components toward the nature of the process performed in the United States or a third country'. Thus, the shift in focus related to the overall circumvention inquiry.

*Decision Memo* at 59, Appx1114. But, this passage only confirms that the circumvention inquiry, which includes the value-added determination, should focus on the nature of the production process. Here, Commerce has already confirmed that the nature of THSM's production processes in Thailand are substantial. In sum, there is no basis in the record evidence to determine that the value-added by THSM in Thailand is minor or insignificant, which itself is contrary to Commerce's other findings in the determination.

### ii. Commerce's Assessment of the Value Added in Thailand Is Inconsistent with the Department's Precedent

Commerce found that the weighted average of the value added in Thailand for a THSM module exported to the United States is [          ]% of the total value of the module, and that this amount constituted a "small proportion."  Appx1242. Commerce fails to explain this finding adequately.

The *Final Determination* offers no explanation of what Commerce considers to be "small." This is striking given that there are several other circumvention cases in which Commerce determined that *significantly lower* levels of value added did not support an affirmative

circumvention finding. For example, Commerce has reached negative circumvention determinations where the value of processing performed in the exporting country was lower, ranging from 12 to 26 percent, and from 10 to 29 percent. *Ferrovanadium and Nitrided Vanadium From the Russian Federation*, 77 Fed. Reg. 6,537, 6,539 (Dep't Commerce Feb. 8, 2012) (preliminary negative determination and extension of time limit for final determination of circumvention of the antidumping duty order) (Commerce rendered a negative final determination in this case as well). *Hot-Rolled Lead and Bismuth Carbon Steel Products from Germany and the UK*, 64 Fed. Reg. 40,336, 40, 340 (Dep't Commerce Jul. 26, 1999). These prior decisions undermine Commerce's conclusion in this instance that creating nearly **[          ]** of the value of the exported product in Thailand was somehow "small," "minor" or "insignificant." Commerce should not have found in the *Final Determination* that this high value-added in Thailand "represents a *small proportion* of the value of the merchandise imported into the United States." *See Certain Tissue Paper Products from the People's Republic of China*, 73 Fed. Reg. 21,580, 21,585–86 (Dep't Commerce Apr. 22, 2008) (affirmative preliminary determination of circumvention

of the antidumping duty order and extension of final determination) (unchanged in Final Determination) (finding that an average value added of 34 percent did *not* constitute a "small proportion," as defined by the Tariff Act § 781(b)(2)(E)) (emphasis added). Instead, THSM has provided significant and meaningful value-added to the final solar module products in Thailand.

Finally, Commerce's failure to explain its value-added finding with respect to THSM is notable given that CSIL's value-added figure is [        ] to that of TTL, and TTL's production process is similar to that of THSM's. It is incongruous to render an affirmative finding with respect to CSIL on this factor while simultaneously making a negative finding with respect to TTL, on the basis [        ] percentage points of a rigid calculation. Commerce's failure to explain what it means to be "small" and how it administers this standard consistently across proceedings renders this decision arbitrary, unsupported by substantial evidence, and not in accordance with law.

In sum, Commerce's findings with respect to value-added are contradicted by record evidence and not in accordance with the statute and agency precedent.

**D.    Substantial Evidence Does Not Support a Conclusion that the Process of Assembly or Completion in Thailand is Minor or Insignificant**

Commerce's affirmative circumvention finding is unsupported by substantial evidence for the reasons discussed *supra*. Moreover, Commerce's overall finding under 19 U.S.C. § 1677j(b)(1)(C), that the process of assembly or completion in Thailand is minor or insignificant, cannot be reconciled with its determination that CSPV cell and module production is a significant, complex process. Through its detailed analysis of the "process of assembly or completion" factor under Section 1677j(b)(2), Commerce reconfirmed in these inquiries that CSPV cell and module manufacturing (including the formation of the p/n junction) is a major, complex manufacturing process that does not amount to minor or insignificant processing. *Decision Memo* at 52, Appx1107. Commerce verifiers witnessed the significance of these multi-billion dollar, massive, and complex manufacturing facilities firsthand when they visited Thailand to verify the accuracy of the information provided by CSIL and TTL in these inquiries. Thus, Commerce's findings on the extensive complexity of CSPV cell and module production are incongruent with its overall conclusion that the process of assembly or

completion in Thailand is minor or insignificant. Further, Commerce failed to explain or address any arguments demonstrating why its findings on the "nature of the production process" should not result in a negative finding of circumvention.

The logic of circumvention proceedings rests on the idea that producers in a country subject to an existing AD/CVD order could set up a "screwdriver" assembly in a third country to change the country of origin and circumvent the order.[13] A key component to a circumvention analysis, therefore, is whether the process of assembly or completion is minor or insignificant.

However, if a production process is significant, extensive, and capital intensive, those third country production processes are not circumventing existing AD/CVD orders in accordance with the governing statute. Rather, producers that put in significant capital, equipment, planning, and labor are investing substantial resources to expand their operations to third countries in order to grow and develop legitimate business opportunities. Thus, the line between circumvention and non-circumvention will often rest on the "minor or insignificant"

---

[13]     SAA, at 893–894.

nature of the production process. In other words, if manufacturing processes are so extensive and complex, such is the case with CSPV cells and modules, those processes logically cannot also be found to be circumventing an existing AD/CVD order.

Commerce's analysis of the significance of CSPV cell and module production compels a negative finding of circumvention in this case. This was notably the *only factor* that remained unchanged in the *Final Determination*, because, unlike the other four factors under 19 U.S.C. § 1677j(b)(2), Commerce did not rely on any mandatory respondent data for its analysis of the nature of production process. *Decision Memo* at 49–53, Appx1104–Appx1108. Instead, Commerce's findings on the "nature of production process" applied broadly to all CSPV cell and module producers in all four segments of the circumvention proceeding. *Id.* Undoubtedly, manufacturing of CSPV cells and modules are highly complex and significant processes. Regardless of any company-specific factors, the significance of this finding alone demonstrates that Commerce's entire affirmative circumvention determination is fundamentally incongruent and is unsupported by substantial evidence.

Commerce made numerous key findings on the complex and extensive nature of CSPV cell production through its comparison to the production of upstream ingots and wafers. First, Commerce observed that the production of CSPV cells involves "significant technical requirements. . . and changing technologies." *Decision Memo* at 50, Appx1106. Specifically, Commerce found that:

> {W}hile the technology required to produce ingots has not significantly changed since it was created, the same is not true for solar cells. Technology improvements in the wafer-to cell process are responsible for most of the performance improvements of solar panels. Because of technological improvements to solar cells, module makers must regularly upgrade their production lines to avoid becoming obsolete. Hence, there are also meaningful technological requirements that must be met before producing solar cells.

*Id*. at 51, Appx1106 (internal quotations omitted). As for labor, Commerce found that CSPV cell and module production requires significantly more direct manufacturing workers as well as a skilled labor force, when compared to ingot and wafer production. *Id*.

More critically, Commerce emphasized the nature of production performed in *each* production step of the CSPV cell process:

> The IEA Report specifies that while each segment of the manufacturing processes require various types of special equipment, solar cell production requires sophisticated, precise and advanced automation equipment, and solar module production requires highly automated machinery and accurate quality-testing requirement at multiple stages. Meanwhile, the IAE Report indicates that ingot production uses simpler, more conventional equipment. Therefore, producing solar cells and modules in the inquiry country involves a multi-step production process that requires more precise and sophisticated equipment at multiple stages compared to producing ingots and wafers in China.

*Id*. at 52, Appx1107 (internal quotations omitted). Commerce also emphasized that CSPV cell and module production requires *over 100 different inputs*, "whereas converting polysilicon into wafers only involves a handful of inputs." *Id*. (emphasis added). These findings go to the heart of Commerce's inquiry into whether the process of assembly or completion in Thailand is "minor or insignificant." Because record evidence overwhelmingly supports a finding that the nature of the producing CSPV cells and modules is significant, extensive, and complex, Commerce's ultimate affirmative circumvention finding is rendered completely illogical. Further, based on Plaintiffs' extensive research as provided to Commerce in written submissions during the

inquiries, it appears that Commerce has *never* previously reached an affirmative finding of circumvention where it also found that the nature of production process was not minor or insignificant.

Because each statutory factor under 19 U.S.C. § 1677j(b)(1) *must be met* to reach an affirmative determination of circumvention, and because substantial evidence contradicts Commerce's finding of one of these statutory factors—that the process of assembly or completion in Thailand was "minor or insignificant,"— Commerce's affirmative circumvention determination cannot be sustained.

### E.    Commerce Failed to Demonstrate that an Affirmative Circumvention Determination Was "Appropriate" Under Section 781(b)(1)(E) of the Act

The *Final Determination* is further defective because Commerce failed to demonstrate the determination to be appropriate, as required by the governing statue. Commerce may only issue an affirmative circumvention determination if it finds that it is "appropriate" to do so under 19 U.S.C. § 1677j (b)(1)(E). Specifically, the statute expressly provides that the Department "*may* include such imported merchandise within the scope of such order" *only if* the Department determines "that

62

action is *appropriate* under {the anti-circumvention provision} to prevent evasion." 19 U.S.C. § 1677j (b)(1)(E) (emphases added).

Neither the statute nor the SAA provides a specific definition of "appropriate" to be applied in the circumvention context. 19 U.S.C. § 1677j; *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,327–330 (Dep't Commerce May 19, 1997) (final rule). Notwithstanding, the Supreme Court has explained that whether federal agency action is "appropriate" hinges on whether the agency has demonstrated its consideration of "all the relevant factors," and pays "at least some attention to cost." *Michigan v. EPA*, 576 U.S. 743, 752 (2015) (citation omitted). The Supreme Court has further indicated that "{n}o regulation is 'appropriate' if it does significantly more harm than good." *Id*. Affirmative determinations of circumvention were not "appropriate" here.

Expansion of the scope of the *Solar I* Orders to cover "CSPV cells and/or modules completed in Malaysia, Thailand, Vietnam, and Cambodia using Chinese-origin components" was not appropriate, and Commerce failed to demonstrate that it fully assessed this statutory requirement. This scope expansion ignores and contradicts the

63

Department's longstanding precedents regarding the nature and
significance of vital processes in the production of CSPV solar cells and
modules. Commerce previously confirmed that it is it inappropriate to
conduct a circumvention inquiry where merchandise was "expressly and
intentionally excluded from the scope of the Orders," as was the case
here. *See Certain Walk-Behind Lawn Mowers and Parts Thereof From
the People's Republic of China*, 88 Fed. Reg. 13,434 (Dep't Commerce
Mar. 3, 2023) (notice of intent to rescind circumvention inquiry on the
antidumping and countervailing duty orders) (Explaining, in a case
regarding merchandise assembled in the United States, "We find that
the inquiry merchandise is excluded from the scope of the orders . . .
We also find that it is *not appropriate* to conduct a circumvention
inquiry on such excluded merchandise.") (emphasis added).

Commerce itself indicated in its original *Solar I* investigation that
converting Chinese-origin wafers into CSPV cells in a third country
would not warrant circumvention inquiries. Commerce stated:
"*Petitioner has the option of bringing additional petitions* to address any
dumping concerns it has *regarding solar modules/panels assembled
from solar cells produced in a third country*." Memorandum from Jeff

64

Pedersen to Gary Taverman, *Scope Clarification: Antidumping and Countervailing Duty Investigations of Crystalline Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*, Inv. Nos. A-570-979 and C-570-980 (Investigations) (Mar. 19, 2012) at 9 (emphasis added), P.R. 179, Appx21515. Here, affirmative determinations were not "appropriate" because they have illegitimately expanded the scope of the *Solar I* Orders, contradicting clear guidance provided to the U.S. solar supply chain by the Department for a decade.

Throughout Commerce's administration of the *Solar I* Orders, Commerce has centered on the location of the formation of the p/n junction as the critical production step to determine whether solar cells or modules were within the scope of the Orders on imports from China. Notwithstanding, the *Final Determination* ignores this history and instead erroneously focuses on the production of wafers as a critical stage for determining circumvention. The formation of a p/n junction is the most transformative step in the manufacture of a CSPV solar cell. For more than a decade, Commerce consistently determined that the manufacturing, assembly, and processing at issue here is qualitatively and quantitatively substantial—imparting the "essential" character of

the CSPV cell. *See Notice of Scope Rulings*, 86 Fed. Reg. 47,476 (Dep't Commerce Aug. 25, 2021); Memorandum from Lauren Caserta to James Maeder, *Final Scope Ruling on the Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells from the People's Republic of China: ET Solar Inc.*, Case Nos. A-570-979, C-570-980 (Scope Inquiry: ET Solar) (June 15, 2021) at 9, 11–12 ("{T}he p/n junction is responsible for creating the conditions that induce the photovoltaic effect that ultimately generates electricity, and that the metallic grids and contacts are only responsible for channeling this electricity out of the cell."). In the words of the original petitioner in the underlying investigations, "a wafer is no more capable of producing electricity than a sliver of river-rock." Letter from Akin Gump Strauss Hauer & Feld to the U.S. Department of Commerce, *NextEra Comments on Auxin's Circumvention Ruling Request*, Case No. A-570-979 (Anti-Circumvention Inquiry Thailand–2022) (May 2, 2022) at 39, P.R. 178, Appx21247. Here, Commerce's appropriateness determination was faulty because it failed to explain why the agency could suddenly reverse course and determine the wafer origin to be determinative rather than the situs of p/n junction formation.

Commerce's claims of appropriateness in the *Final Determination* are unavailing. Commerce simply retreats from its previous assurances by contending that in "the {*Solar I*} investigation, we stated that there was the option for bringing additional petitions regarding assembly of solar cells and modules in a third country, but did not prelude circumvention inquiries." *Decision Memo*, P.R. 595, Appx1132. In making this claim, Commerce ignores that the agency has discarded the decade-long administration of an order and the instructions upon which an entire industry has relied in orienting its supply chains. The *Final Determination* thus fails to demonstrate that Commerce made the requisite determination of appropriateness pursuant to the terms of the statute.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for Judgment on the Agency Record and remand this case to Commerce with instructions consistent with the points set forth in this Memorandum.

Respectfully submitted,

<u>/s/ Jonathan M. Freed</u>                         <u>/s/ Jonathan T. Stoel</u>

Jonathan M. Freed                          Jonathan T. Stoel
MacKensie R. Sugama                        Michael G. Jacobson
**TRADE PACIFIC PLLC**                      Nicholas R. Sparks
700 Pennsylvania Avenue, SE,                **HOGAN LOVELLS US LLP**
Suite 500                                   Columbia Square Building
Washington, DC  20003                       555 Thirteenth Street, NW.
(202) 223-3760                              Washington, DC 20004
jfreed@tradepacificlaw.com                  (202) 637-6634
                                            jonathan.stoel@hoganlovells.com
*Counsel for Trina Solar Science*
*& Technology (Thailand) Ltd.*              *Counsel for Canadian Solar*
                                            *International Limited and*
                                            *Canadian Solar Manufacturing*
                                            *(Thailand) Co., Ltd.*

Dated: June 13, 2024

## CERTIFICATE OF COMPLIANCE

The undersigned counsel hereby certify that the Memorandum of Law in Support of Plaintiffs' Motion for Judgment Upon the Agency Record, dated June 13, 2024, complies with the word-count limitation described in the Standard Chambers Procedures and Scheduling Order. The Memorandum of Law contains 12,915 words according to the word-count function of the word-processing software used to prepare the Memorandum.

Respectfully submitted,

/s/ Jonathan M. Freed

Jonathan M. Freed
MacKensie R. Sugama
**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE,
Suite 500
Washington, DC  20003
(202) 223-3760
jfreed@tradepacificlaw.com

*Counsel for Trina Solar Science*
*& Technology (Thailand) Ltd.*

/s/ Jonathan T. Stoel

Jonathan T. Stoel
Michael G. Jacobson
Nicholas R. Sparks
**HOGAN LOVELLS US LLP**
Columbia Square Building
555 Thirteenth Street, NW.
Washington, DC 20004
(202) 637-6634
jonathan.stoel@hoganlovells.com

*Counsel for Canadian Solar*
*International Limited and*
*Canadian Solar Manufacturing*
*(Thailand) Co., Ltd.*

Dated: June 13, 2024